UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- X
                                                        :
                                                        :
ISAAC JAKOBOVITS, as Trustee of the LITE                :
TRUST I,                                                :          17-cv-3527-ARR-RER
                                                        :
                    Plaintiff,                          :
                                                        :          **OPINION & ORDER**
        -against-                                       :
                                                        :
PHL VARIABLE INSURANCE COMPANY,                         :
                                                        :
                    Defendant.                          :
                                                        :
                                                        :
---------------------------------------------------------------------- X

ROSS, United States District Judge:

    Before me are plaintiff Isaac Jakobovits, as trustee of the LITE Trust I ("Lite," or "plaintiff"),

and defendant PHL Variable Insurance Company's ("PHL" or "defendant") cross-motions *in*

*limine* to exclude expert testimony pursuant to the standards set forth in Federal Rule of Evidence

702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny. For the

reasons set forth below, I grant defendant's motion to exclude plaintiff's expert Kevin Glowacki

in its entirety, grant in part and deny in part defendant's motion to exclude plaintiff's expert

Raymond Goldblatt, and grant in part and deny in part plaintiff's motion to exclude defendant's

experts Timothy Pfeifer and David Sandberg.

## BACKGROUND

    Knowledge of the background facts of this action is assumed, and I will discuss only those

facts necessary to explain my decision. At issue are insurance policies issued by PHL known as

Phoenix Accumulator Universal Life ("PAUL") policies. First Am. Compl. ¶ 1 ("Compl."), ECF

No. 12. The at-issue policies were issued in series known as PAUL III, PAUL IIIa, PAUL IIIb,

and PAUL IIIc. *Id.* ¶ 260. Each of these policy series has different price terms and were issued at

different times. Decl. of Duane Grabber in Supp. Def.'s Mot. to Exclude Kevin Glowacki ¶ 3 ("Grabber Decl."), ECF No. 98-2.[1] Plaintiff initially brought claims concerning fifty-three policies. *See* May 18, 2018 Op. & Order 2, ECF No. 38. Following my partial dismissal of the action and parties' subsequent stipulations of dismissal of other claims, ECF Nos. 83, 84, "[t]he Second Claim for Relief in the [First Amended Complaint] as to . . . 13 [p]olicies . . . is the sole remaining claim in the case,"[2] Joint Stipulation of Dismissal ¶ 4, ECF No. 84.

Each PAUL policy is a "flexible premium universal life insurance policy," which provides both a death benefit to the policyholder and a savings component known as "policy value," "cash value," or "accumulated policy value." Compl. ¶ 13. The policy value grows as premiums are paid and is credited with interest and debited with administrative and cost of insurance ("COI") charges. *Id.* Each policy entitled PHL to adjust the COI rate, and thus its monthly COI charge.[3] *Id.* ¶ 22. Plaintiff's Second Claim for Relief alleges that PHL breached the terms of each policy prohibiting PHL from increasing applicable COI rates in a manner that would "discriminate[] unfairly within any class of insureds" and from "distribut[ing] past gains or recoup[ing] prior losses . . . by changing rates." Compl. ¶ 279. Plaintiff contends that "PHL did not increase the COI rate

---

[1] Defendant initially requested leave to file this and other documents under seal, *see* ECF Nos. 97, 98, 99, but later withdrew the motion to seal. ECF No. 108.

[2] The Joint Stipulation of Dismissal refers to policies listed in "Exhibit B," but neither the First Amended Complaint nor the Joint Stipulation of Dismissal contains this exhibit. The parties agree in their *Daubert* briefing that the thirteen remaining policies are those identified in the Supplemental Report of Plaintiff's Expert Kevin Glowacki. *See* Def.'s Mem. in Supp. Mot. Exclude Kevin Glowacki 3 n.2, ECF No. 105-1 ("Only the breach of contract claim on the 13 [p]olicies identified in Mr. Glowacki's supplement[al] report remains."); Pl.'s Mem. in Opp'n Mot. Exclude Kevin Glowacki 1–2, ECF No. 105-11 ("As the case progressed, Lite's experts—including Mr. Glowacki—performed an analysis on each of the policies in this suit and determined that the thirteen policies shown in Glowacki's Supplemental Report were policies on which Lite sustained monetary damages as the result of [Cost of Insurance] adjustments . . . .").

[3] The COI charge is calculated by multiplying the policy's Net Amount at Risk, as defined in the policy documents, by the per dollar COI rate. Compl. ¶ 21.

applicable to similar PAUL policies for the same class of insureds" and instead "targeted only certain policies"—those policies issued in series PAUL III and PAUL IIIa with insured ages 68 and higher and face amounts of $1 million or higher, and in series PAUL IIIb and PAUL IIIc with insured ages 65 and higher and face amounts of $1 million or higher. *Id.* ¶ 260; *see also* Grabber Decl. ¶¶ 3–4 (confirming the at-issue increases applied only to these policy series). Lite also alleges that this "rate hike . . . violated the policies' prohibition on recouping past losses and requirement that any change in COI rates be determined prospectively." Compl. ¶ 261 (internal quotation marks and alteration omitted).

"Lite is in the business of purchasing life insurance policies on the secondary market," also known as the life settlement market. Pl.'s Opp'n to Mot. Exclude Raymond Goldblatt 1 ("Goldblatt Opp'n"), ECF No. 106-8. A secondary purchaser buys life insurance policies from the insured (or another policy owner) and becomes "entitled to the same benefits, and has the same responsibilities, as the original policy owners." *Id.* Once Lite purchased the at-issue policies, it became entitled to any death benefits and responsible for paying premiums and cost of insurance. Following PHL's alleged breach, Lite declined to continue paying for each policy, and PHL terminated each policy as a result. *See* Suppl. Schedule 1 to Suppl. Expert Report of Kevin M. Glowacki, ECF No. 105-14 (chart of alleged damages for the 13 at-issue policies); Compl. ¶¶ 35, 55, 59, 85, 93, 110, 142, 165, 182, 185, 193, 202, 252 (discussing termination of each at-issue policy).

On the issue of whether COI rate increases "unfairly discriminated," defendant has designated expert Timothy C. Pfeifer. *See* Expert Report of Timothy C. Pfeifer ("Pfeifer Report"), ECF No. 103-1. Defendant also designated David Sandberg to provide background on the secondary life insurance market and opine on damages attributable to defendant's allegedly inaccurate grace

notices.[4] *See* Expert Report of David Sandberg ("Sandberg Report"), ECF No. 103-2. Plaintiff

submitted the report of Raymond Goldblatt in rebuttal to the Pfeifer and Sandberg Reports. *See*

Expert Report of Raymond Goldblatt ("Goldblatt Report"), ECF No. 98-5. Plaintiff also designated

Kevin M. Glowacki to opine on the proper measure of damages should plaintiff prove a breach of

the applicable insurance policies. *See* Expert Report of Kevin M. Glowacki ("Glowacki Report"),

ECF No. 105-3. Defendant submitted rebuttal reports from both Pfeifer and Sandberg in opposition

to Glowacki's calculation of damages, and Glowacki supplemented his Report in response to these

criticisms. *See* Expert Rebuttal Report of Timothy C. Pfeifer ("Pfeifer Rebuttal"), ECF No. 103-

5; Expert Rebuttal Report of David Sandberg ("Sandberg Rebuttal"), ECF No. 103-4; Suppl.

Expert Report of Kevin M. Glowacki ("Glowacki Suppl. Report"), ECF No. 105-5.

## LEGAL STANDARD

Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable principles and
> methods; and (d) the expert has reliably applied the principles and methods to the
> facts of the case.

In *Daubert*, the Supreme Court charged district courts with conducting "a preliminary

assessment of whether the reasoning or methodology underlying the [proffered expert] testimony

is scientifically valid and of whether that reasoning or methodology properly can be applied to the

facts in issue." 509 U.S. at 592–93. In *Kumho Tire Co. v. Carmichael*, the Court confirmed that

judges should conduct this assessment for all expert testimony, not just expert testimony based on

science. 526 U.S. 137, 147 (1999). Because "the admissibility of all expert testimony is governed

---

[4] As discussed *infra*, the allegedly inaccurate grace notices are no longer at issue in this case.

by the principles of [Federal Rule of Evidence] 104(a) . . . the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Fed. R. Evid. 702, advisory committee's note to 2000 amendment (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)).

Although Rule 702 and *Daubert* itself "set forth specific criteria for [my] consideration, the *Daubert* inquiry is fluid and will necessarily vary from case to case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). "[T]he gatekeeping inquiry must be tied to the facts of a particular case." *Kumho Tire*, 526 U.S. at 150 (internal quotation marks omitted). Though the test is flexible, "it is critical that an expert's analysis be reliable at every step . . . the *Daubert* 'requirement that the expert testify to scientific knowledge . . . means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible.'" *Amorgianos*, 303 F.3d at 267 (emphasis omitted) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)). "In deciding whether a step in an expert's analysis is unreliable, [I] should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* In particular, I must be mindful of circumstances in which "there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). I am to distinguish these circumstances from those where there is "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method," in light of "the liberal admissibility standards of the federal rules" and the fact that our adversary system will also serve as a check on "debatable[] expert testimony." *Amorgianos*, 303 F.3d at 267.

## DISCUSSION

### *Goldblatt*

Defendant objects to numerous aspects of Goldblatt's report, as well as his qualifications to opine on issues of the COI rates. For the reasons set forth below, I exclude certain portions of Mr. Goldblatt's anticipated testimony.

### 1. *Goldblatt May Not Offer Affirmative Opinions*

PHL argues that because Mr. Goldblatt's report was submitted on the deadline for rebuttal reports, all affirmative opinions in his report should be excluded. Def.'s Mem. in Supp. Mot. Exclude Raymond Goldblatt 7–9 ("Def.'s Goldblatt Mem."), ECF No. 106-1. Plaintiff characterizes this argument as a "red herring" because "nearly every paragraph [of Goldblatt's rebuttal] . . . responds to and cites the Pfeifer Report." Goldblatt Opp'n 16.

I agree with PHL that the Goldblatt Report inappropriately advances a number of affirmative opinions, and that mere citation to the reports of Pfeifer or Sandberg does not render an affirmative opinion a "rebuttal" opinion. For example, the Goldblatt Report identifies a putative flaw in the Pfeifer Report—Pfeifer's failure to discuss PHL's under-pricing of the PAUL series—but does so by advancing a number of affirmative opinions, including that the alleged under-pricing "appears to have caused strain on [PHL's] reserving and liquidity" and that PHL "was too aggressive in their marketing and pricing of the PAUL products." Goldblatt Report ¶ 12. Goldblatt cites no sources for these two propositions, and further opines without citation that the "COI increases to correct [PHL's] problems were inequitable to existing insureds and policyowners and discriminatory against certain classes of policyholders." *Id.* None of these statements "rebuts" an assertion in the Pfeifer Report, and similar affirmative assertions are scattered throughout the Goldblatt Report. *E.g. id.* ¶ 13 ("[PHL] simply priced their products too low and then corrected by discriminating against existing policyholders in the class."); *id.* ¶ 14 ("[PHL] targeted their

'problem policyholders' only, which amounts to discrimination against a class of insureds."); *id.*
¶ 15 ("It is more likely that this 'class' [of policyholders of a certain age with greater than $1
million in face amount] was specifically created by PHL to allow it to price discriminate between
'ordinary' customers and the life settlement investors that Pfeifer complains of repeatedly in his
report."); *id* ¶ 21 ("The circumstances of the rate change and the creation from whole cloth of a
new 'class' of policies that the rate change would discriminate against provides reasonable grounds
to assume that the rate change was intended to target life settlement investors and cause them to
allow policies to lapse, recouping [PHL's] losses at the expense of policyholders."); *id.* ¶ 31
("[H]arm may have been done if an investor partner was spooked by [PHL's] increases – this was
surely harmful as a foregone opportunity."); *id.* ¶ 38 ("[PHL] conducted a bait-and-switch: it
illustrated for customers at the time of sale that to maintain the policies, they would have to pay in
certain amounts over time . . . when that approach wasn't generating sufficient profits, [PHL]
changed the price . . . destroying the value of the asset . . . .").

Plaintiff contends that the paragraphs challenged by defendant simply "state[] either a general
background point regarding general life insurance industry practices or offers an opinion directly
rebutting the PHL expert opinion being discussed" and should therefore be admitted. Goldblatt
Opp'n 16. However, it is clear from the above that most of the "rebuttal" opinion directly advances
Goldblatt's theories of the COI increases—that PHL structured them to target life settlement
investors who would cause the policies to lapse in response—and only "rebuts" Pfeifer and
Sandberg in the broad sense that they advance theories at odds with Goldblatt's. Further, the
affirmative opinions advanced that the COI increases were conducted to discriminate against life
settlement investors, improperly recoup PHL's alleged losses, and harmed Lite because it made it
harder for Lite to find a purchaser for the policy are not "general background point[s] regarding

general life insurance industry practices." If plaintiff wanted Mr. Goldblatt to advance these opinions, it could have designated him as an affirmative expert by the appropriate deadline; Mr. Goldblatt testified that he was retained in late August 2021, well before the December 10, 2021 deadline for affirmative expert reports. Dep. of Raymond Goldblatt Tr. 7:12, ECF No. 106-14.

Federal Rule of Civil Procedure 26(a)(2)(D)(ii) contemplates the submission of expert reports "intended solely to contradict or rebut evidence on the same subject matter identified by [another expert witness] within 30 days after the other party's disclosure." Nothing in this provision of the Federal Rules suggests that a rebuttal expert may provide affirmative opinions merely by citing another party's expert, and the Goldblatt Report plainly contains assertions beyond those "intended solely to contradict or rebut evidence" presented by defendant's experts. "A rebuttal expert report is not the proper 'place for presenting new arguments, unless presenting those arguments is substantially justified and causes no prejudice.'" *Ebbert v. Nassau County*, No. 05-CV-5445 (AKT) 2008 WL 4443238, at *13 (E.D.N.Y. Sept. 26, 2008) (quoting *STS Software Sys., LTD v. Witness Sys., Inc.*, No. 04-CV-2111, 2008 WL 660325, at *2 (N.D. Ga. Mar. 6, 2008)). Plaintiff has not identified any reason why it did not submit an affirmative expert report from Goldblatt, nor has it advanced an argument that defendant was not prejudiced. Accordingly, I hold that plaintiff cannot elicit Goldblatt's testimony as to:

- The initial pricing decisions of PHL and whether PHL deliberately under-priced policies in the PAUL series;
- Whether PHL was deliberately targeting life settlement investors with the at-issue COI rate increases;
- PHL's financial condition or liquidity;
- Whether the increase in COI rate "recouped" PHL's losses; or
- The harm to Lite caused by the COI rate increases.

### 2.   *Goldblatt is Qualified*

Mr. Goldblatt founded Joshua Doore Capital Group, LLC, an "actuarial consulting firm focusing on the life settlement market." Goldblatt Report ¶ 2. He has a Bachelor of Business Science degree in Actuarial Science, is a Chartered Financial Analyst, a Fellow of the Institute of Actuaries, and Member of the American Academy of Actuaries. *Id.* ¶ 3. Since founding Joshua Doore Capital Group, Mr. Goldblatt has spent 14 years in the life settlement market "[a]cting as a provider and broker, valuation pricing expert, structurer of life settlement pools, and ha[s] sourced policies and optimized policy premiums for institutions and individuals." *Id.* ¶ 4. In this capacity, Mr. Goldblatt has "valued thousands of life insurance policies in the secondary and tertiary markets . . . [and] performed monthly life settlement portfolio valuations." *Id.* ¶ 5.

To analyze Mr. Goldblatt's qualifications, I must first summarize the ultimate issue of liability. As plaintiff notes, "this case is about whether COI rate increases were allowed by the policies at issue." Goldblatt Opp'n 9. Whether the rate increases were permissible will turn on what constitutes "unfair" discrimination within a class of insureds. *See id.*; Def.'s Goldblatt Mem. 17 ("Lite's allegation is that [PHL]'s 2011 COI rate increase discriminated unfairly among policyholders."). As defendant explains, "insurance relies on classifying risks and applying discrimination in an actuarial sense. Simply put, not everyone pays the same insurance rates. While discrimination in the rates charged is allowed and necessary, unfair discrimination is not." Def.'s Goldblatt Mem. 15. Plaintiff does not contest this proposition. *See* Goldblatt Opp'n 11 (calling defendant's discussion "irrelevant" because "[e]ven the most casual purchaser of life insurance understands that smokers generally pay more than non-smokers, and males generally pay more than females" but "[t]hose types of discrimination are not at issue here").

Since some discrimination is permitted in insurance, whether PHL's discrimination in increasing COI rates for some policies but not others was "unfair" is the primary focus of both

liability experts. Defendant's expert Pfeifer opined that PHL's rate increase was not "unfair" and complied with the terms of the life insurance policies. Pfeiffer Report ¶ 7. Goldblatt concluded that Pfeifer's report "presented no alternatives" to COI rate increases that may have accomplished PHL's goals without resorting to the COI rate increase. Goldblatt Report ¶ 10.

Seeking to disqualify Goldblatt, PHL argues that "Mr. Goldblatt has never had a role in pricing universal life insurance products[,] . . . never led an effort to redetermine non-guaranteed elements (*e.g.*, COI rates) in a universal life insurance policy[,] . . . never had occasion to review the actuarial modeling and analysis associated with determining a COI rate increase for any insurer[,] . . . [and] never drafted a life insurance company's internal determination policy for setting COI rates." Def.'s Goldblatt Mem. 12. Defendant also notes that although Goldblatt "agrees that Actuarial Standard of Practice ('ASOP') 2 provides industry guidance to actuaries re-determining COI rates, [Goldblatt] read ASOP 2 for the first time until [*sic*] his engagement in this case." *Id.* at 13. Asked at his deposition what ASOP 2 requires, Goldblatt testified that he did not know and would have to review ASOP 2 again. *Id.* Finally, defendants contend that because setting COI rates is a "specialized area of actuarial practice," Goldblatt cannot be qualified solely because he is an actuary. *Id.* at 14–15.

In response, Lite emphasizes that the expert qualification requirement in the Second Circuit is "liberally construed." *See* Goldblatt Opp'n 7–8 (quoting *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04-CV-7369 (LTS), 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006)). Lite contends that Goldblatt's "education and experience in the general field of actuarial science as it relate[s] to life insurance[] meets the qualification requirements of *Daubert* and its progeny." *Id.* at 8. Plaintiff also argues that PHL's arguments are "an attempt to disqualify Goldblatt because he is not an employee of an insurance company." *Id.* Although this characterization lacks merit, I

10

agree that given the relatively low bar to demonstrate qualifications, plaintiff has shown that Goldblatt's experience as a life insurance investor and consultant and as an actuary is such that his "opinion will likely assist the trier of fact in arriving at the truth." *Valentin v. New York City*, No. 94-CV-3911 (CLP), 1997 WL 33323099, at *14 (E.D.N.Y. Sept. 9, 1997). Although I agree with defendant that Goldblatt would be better qualified if he had more experience applying ASOP 2, PHL has not demonstrated that an actuary lacking experience with ASOP 2 would not be able to rely on his training to review and apply this particular practice standard to a rate increase.

*3. Plaintiff Fails to Demonstrate the Relevance or Reliability of Certain Rebuttal Opinions*

Plaintiff failed to carry its burden to show that certain of Goldblatt's rebuttal opinions are relevant or are the result of reliable principles and methods.

First, Goldblatt testified that he will not offer an opinion that PHL discriminated "unfairly," only that he would offer an opinion that PHL discriminated. Dep. of Raymond Goldblatt Tr. 81:2-5 ("I can't define unfair. I can tell you that's the way it's been done. Whether it's fair or unfair, I think that's between the legal beagles, not me."); *id.* 116:10-17 (Mr. Goldblatt: "So here, it's discriminated because of size of policy and because of age. Whether it's unfair or not, I can't comment. That's not my interest." Mr. Smelley: "So are you suggesting there's anything improper about this discrimination?" Mr. Goldblatt: "I'm suggesting it was discrimination. That's all I can say."). As discussed, the parties agree that the key issue in this case is whether PHL discriminated *unfairly*. On this point, both parties direct my attention to Judge McMahon's opinion in related litigation in the Southern District of New York. *Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456 (S.D.N.Y. 2014).[5] When interpreting the "unfair discrimination"

___

[5] Because both parties rely on this case, I follow its reasoning for the limited purpose of discussing the parties' proposed expert testimony. The *Fleisher* opinion is not binding precedent, and its preclusive effect (if any) and logic are better explored in conjunction with the parties' anticipated motions for summary judgment.

provision, Judge McMahon noted that the underlying policies do not define "unfair discrimination," but the policies track "a nearly identical provision in New York Insurance Law" prohibiting "unfair discrimination between individuals of the same class and of equal expectation of life." *Id.* at 479 (emphasis omitted) (quoting N.Y. Ins. Law § 4224(a)(1)). Judge McMahon found that "New York deems discrimination to be 'fair' as long as the insurance company's differential treatment of insureds is appropriate under generally accepted actuarial standards." *Id.* (collecting authorities). Judge McMahon noted that the parties' experts disagreed on the propriety of the COI rate increase under those actuarial standards and declined to grant summary judgment on the issue. *Id.* at 480–81. PHL argues that because "unfair" discrimination is the key issue, allowing Goldblatt to testify that the COI rate increase was merely discriminatory would be "confusing, irrelevant, and will not assist the jury." Def.'s Goldblatt Mem. 18.

Lite suggests that PHL's argument is "irrelevant" and that the proper question is "whether it was appropriate to adjust COI rates on the specific policies at issue, or whether PHL violated the policies by doing so." Goldblatt Opp'n 11. But plaintiff's framing is the same as asking whether PHL "unfairly discriminated," because PHL indisputably had the right to raise COI rates as long as the increase did not "discriminate unfairly within any class of insureds." Compl. ¶ 22. I do not see how asking whether discrimination was "unfair" differs from asking whether it was "appropriate."

Lite also objects to defendant's argument because whether discrimination was "unfair" is an ultimate legal question. Goldblatt Opp'n at 11. This argument ignores the fact that Federal Rule of Evidence 704(a) states that "[a]n opinion is *not* objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a) (emphasis added). Under the Federal Rules of Evidence, "[t]he basic approach to opinions . . . is to admit them when helpful to the trier of fact. In order to render this

approach fully effective and to allay any doubt on the subject, the so-called 'ultimate issue' rule [was] specifically abolished by [FRE 704]." Fed. R. Evid. 704 notes of advisory committee on 1972 proposed rules. Nor is this a case where Mr. Goldblatt would be offering an "opinion[] embodying legal conclusions that encroach[es] upon [my] duty to instruct on the law." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *see also Ebbert*, 2008 WL 4443238, at *11–*12 (holding references to legal terms such as "disparate treatment" and "comparable worth" were not properly advanced by expert). The parties agree that whether discrimination is "unfair" is informed by actuarial standards, and although the answer to this actuarial question will help the factfinder decide whether PHL breached the terms of its insurance policies, it is not a legal opinion.

Because Goldblatt will not testify to whether PHL's discrimination was unfair, only that it was discriminatory, I find that plaintiff has not carried its burden to demonstrate that Goldblatt's expertise will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The parties agree that discrimination is how insurance works, and Lite has not demonstrated by a preponderance of the evidence that Mr. Goldblatt's expertise is required to help the jury understand this. Accordingly, I will not admit any testimony from Mr. Goldblatt that details PHL's "discrimination" in raising COI rates.

Defendant also argues that Goldblatt's opinions that PHL did not evaluate alternatives that would have complied with ASOP 2 and would have been discriminatory and is based on Goldblatt's *ipse dixit*. Goldblatt identifies two purported flaws in Pfeifer's analysis.[6] The first is that Pfeifer did not consider that PHL could have waited to see the impact of changes to policy

---

[6] During his deposition, Mr. Goldblatt also raised the third alternative that PHL not raise COI rates at all. I do not address this contention because it is not contained in the Goldblatt Report as required by Federal Rule of Civil Procedure 26(a)(2)(B)(i) and plaintiff has not attempted to show that the requirements of Rule 702 are met with respect to this opinion. *See generally* Goldblatt Opp'n.

terms in each policy's tenth "policy year." Goldblatt Report ¶ 17. To summarize, the terms of the underlying policies changed after the ninth policy year to require that the policy's net *surrender* value exceed the required monthly deductions, whereas for the first nine years the policyholder needed only have a (lower) net *account* value that exceeded the required monthly deductions. *Id.* As illustrated by an example in the Goldblatt Report, if a policyholder is making minimum payments and not accumulating cash value in the policy, this change results in a significant balloon payment in the tenth policy year and an increase in required payments thereafter. *Id.* Life settlement investors exhibit this payment behavior, so the balloon payment and change in required monthly payment would significantly impact the expected investment return on the life insurance policy and might cause investors to allow the policy to lapse. *Id.* Thus, Goldblatt concludes that PHL "perhaps acted prematurely raising COI rates" and faults Pfeifer for not considering this alternative to raising the COI rate. *Id.* ¶ 18.

Goldblatt also identifies the alternative of increasing the COI rate on all holders of PAUL policies, contending that an approach of "lower COI increases spread across more individuals . . . would be reasonable." *Id.* ¶ 14. Goldblatt came to this conclusion based on Pfeifer's conclusion that PHL's approach was "reasonable," inferring that his alternative approach would also be reasonable. *Id.*

PHL emphasizes Goldblatt's Report does not explain why PHL or its experts was required to analyze any of the alternatives to the COI rate increase, simply saying at his deposition that "my job as a rebuttal guy is to say what did he [Pfeifer] miss out, and I'm saying he missed out on the other things that could be mentioned." Def.'s Goldblatt Mem. 25 (quoting Dep. of Raymond Goldblatt Tr. 140:19–24). Further, "Mr. Goldblatt did no mathematical analysis on whether waiting for the year 10 premium bump would matter," and "testified he did not know whether the

premium influx [from the bump] would have mitigated PHL's need to increase COI rates." *Id.* at 25–26 (citing Dep. of Raymond Goldblatt Tr. 141:11–20, 175:1–7). Lite responds that "Goldblatt did not run calculations on his third proposed alternative [of waiting for the premium bump] because he is not opining that any of his proposed alternatives would have alleviated PHL's perceived need for the COI rate increase. Rather, he is faulting Pfeifer for not considering . . . any alternative courses of action." Goldblatt Opp'n 14. Plaintiff argues that Goldblatt's discussion is relevant because "[e]ven if the alternatives Goldblatt suggested would not have alleviated the need for the 2001 [*sic*] rate increase, that is not the point. Considering such alternatives may have changed PHL['s] desired course of action or may have changed the amount of the COI rate increase, even if the increase was not completely eliminated." *Id.* (citation omitted). Plaintiff then characterizes PHL's arguments as relating to "the strength of Goldblatt's methodology and conclusions," which "are issues of credibility—not admissibility." *Id.*

Plaintiff's position ignores the requirement that "if [a] witness is relying solely or primarily on experience," as Mr. Goldblatt is, "then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702, advisory committee's note to 2000 amendments. The Goldblatt Report contains no explanation for his conclusion that Mr. Pfeifer should have analyzed the potential alternatives of adopting a "wait-and-see" approach to the year-ten premium bump or raising COI rates across all PAUL policies.[7] Although plaintiff disclaims any need for Mr. Goldblatt to have explained his position because he is simply "faulting Pfeifer," Goldblatt Opp'n 14, Lite's argument misapprehends the burden of proof on admissibility. It

---

[7] For instance, Mr. Goldblatt does not contend that anything in ASOP 2 or actuarial practice requires the consideration of alternatives when considering changing a non-guaranteed rate such as the COI rates.

15

remains incumbent upon plaintiff to demonstrate that the testimony of any expert, affirmative or rebuttal, complies with Rule 702. I am not required "to admit opinion evidence that is connected to existing [facts] only by the *ipse dixit* of the expert." *Joiner*, 552 U.S. at 146. Further, the only opinion that Goldblatt could offer on this point is speculative—that consideration of these alternatives *might* have alleviated the need for PHL to increase rates. Because Goldblatt's Report on alternatives to the COI increase is conclusory, unexplained by his experience or qualifications as an actuary, and contains no description of the "principles and methods" upon which he relied in forming his opinion, I exclude any of Goldblatt's testimony concerning Pfeifer's alleged failure to consider "alternatives" to the COI rate increase.

Defendant does not dispute any other rebuttal points raised by Mr. Goldblatt and I find the remainder of his rebuttal report admissible.

### Glowacki

Plaintiff's expert on damages Kevin M. Glowacki is a director at Berkeley Research Group, LLC, a licensed CPA, Certified Fraud Examiner, and has eight years of experience with life settlement origination and investing. Glowacki Report ¶¶ 2–5. He has also consulted in the life settlement industry, both as an expert witness and as a business advisor, for seventeen years. *Id.* ¶ 6. PHL does not dispute his qualifications to opine on the question of damages and only challenges his methodologies. *See generally* Def.'s Mem. in Supp. Mot. Exclude Kevin M. Glowacki ("Def.'s Glowacki Mem."), ECF No. 105-1. I agree that Mr. Glowacki is qualified to opine on the putative damages in this case. However, because I find that Mr. Glowacki's anticipated testimony on damages is not relevant to a fact in issue, I exclude it in its entirety.

PHL advances three intertwined arguments that Glowacki's damages opinion is irrelevant and will not assist the jury because it does not calculate damages recognizable by New York law. First, defendant notes that Glowacki has attributed negative money damages to 8 of the 13 policies. That

is, he has assumed that the policies would be reinstated and that Lite would have to pay catch-up premium and COI payments on them. Def.'s Glowacki Mem. 8; *accord* Glowacki Report ¶ 19 (Glowacki's calculation "assum[es] that any COI [p]olicies for which PHL either wrongly increased the COI rates or requested premiums in excess of what was allowed under the insurance policy should never have lapsed and would have remained in force until the earlier of 1) the insured's date of death or 2) the date of my report"). Following the submission of Sandberg and Pfeifer's rebuttal reports, Glowacki updated his figures to correct calculation issues identified in the rebuttals but did not change the methodology. Glowacki Suppl. Report ¶ 4. The "negative damages" figure for a policy reflects a policy where the underlying insured is still living, meaning that Lite would owe premiums to PHL if the policy were reinstated and would not receive a death benefit. *See* Def.'s Glowacki Mem. 8–9 (chart summarizing damages from Glowacki's Supplemental Report).

Under New York law, "a breaching party is liable for all direct and proximate damages which result from the breach." *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (citing *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205 (1886)). As defendant sees it, the negative damages are essentially admissions "that there are no damages associated with the [p]olicies w[h]ere the insureds are living" and the claims relating to these policies should be dismissed, because without damages there can be no breach of contract claim under New York law. Def.'s Glowacki Mem. 9. Plaintiff responds that "[t]his argument is wrong because it incorrectly conflates the concepts of (i) whether a plaintiff has been damaged by a breach of contract, (ii) the measure of those cash damages under any particular accounting method or theory, and (iii) the specific question in this case of whether the policy holder had to pay premiums and/or is presently entitled to a benefit under the policy." Pl.'s Mem. in Opp'n Mot. Exclude Kevin

M. Glowacki 9 ("Glowacki Opp'n"), ECF No. 105-11. Plaintiff explains that "Glowacki's calculations show the monetary damages, in terms of cash flow, that would make the policyholder whole again for each policy," and that "Glowacki does not present just the policies for which PHL owes Lite money damages now, but for *all* the policies where PHL damaged Lite by improperly raising the COI rates." *Id.*

Plaintiff's position turns on the assumptions that the jury will find each individual policy was breached and will grant the relief of reinstating the policies, thus entitling Lite to collect all potential death benefits but requiring it to pay all premium and COI charges that have accrued since the policies lapsed. *See id.* at 10 ("Lite is not requesting monetary damages for the policies for which the insured is still alive. Rather, Lite is requesting that those policies be reinstated."). Plaintiff cites no law or provision of the underlying policies that would allow for such relief and fails to respond to defendant's point that because each policy is an individual contract, plaintiff is entitled to no damages where their expert has calculated that Lite *saved* money by PHL's alleged breach of the policy terms.

Relatedly, defendant argues that because Glowacki grouped the thirteen policies together and generated a single final damages number, "he did not provide [p]olicy-specific calculations of the 'damages attributable to the breach' for any particular [p]olicy." Def.'s Glowacki Mem. 8. Instead, "Mr. Glowacki grouped 13 [p]olicies that insured 13 different lives and lapsed between February 2012 and October 2014 . . . then treated them like one contract, for which he provided one damage number." *Id.* at 9. PHL argues that because Lite will have to "establish[] that the 2011 COI rate increase breached" each policy, the jury will not be assisted in determining the damages attributable that breach by Glowacki's aggregation approach. *Id.* Plaintiff responds that "[t]his argument is disproven by PHL's own Motion," because PHL includes a policy-by-policy table

summarizing Glowacki's calculations of the premiums owed and death benefit (if any) to be received by Lite. Glowacki Opp'n 10. Plaintiff contends that defendant's position "is simply false," *id.*, but fails to grapple with PHL's argument—that Lite cannot advance a single damages figure where it must prove breach of each underlying policy. PHL responds that the calculations in its table are not "per policy" because each calculation is merely a death benefit, if any, minus back premiums, which would not be the measure of damages. Def. Reply in Supp. Mot. Exclude Glowacki 7 ("Def.'s Glowacki Reply"), ECF No. 101.

Finally, PHL argues that the proper measure of damages in this case is not based upon a hypothetical reinstatement but "the additional insurance charges incurred as a result of the COI rate increase or the impact to the value of the investment," and notes that the court in *Fleisher* approved a settlement based on recovering a portion of the alleged overcharges. Def.'s Glowacki Mem. 10 (citing *Fleisher v. Phoenix Life Ins. Co.*, Nos. 11-CV-8405 (CM), 14-CV-8714 (CM), 2015 WL 10847814, at *4, *9 (S.D.N.Y. Sept. 9, 2015)). Defendant implies that the Glowacki calculation is an improper attempt to increase damages because he knew which insured died prior to making his calculation. *Id.* Plaintiff contends that Glowacki "did not arbitrarily pick the policies on which he calculated" but instead "performed his analysis on all the policies that were involved in this suit and found that Lite incurred damages on 13 of the policies as a result of PHL's COI increases." Glowacki Opp'n 11. Again, rather than engaging with defendant's argument, plaintiff prefers to characterize PHL's point as a "gross misrepresentation of Glowacki's work" and asks me to ignore it. *Id.*

I hold that plaintiff has not carried its burden to demonstrate that Glowacki's opinion on damages would assist the jury. First, "[i]n New York, 'the general rule is that damages for breach of contract are computed *at the time of breach*.'" *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d

Cir. 2021) (emphasis added) (quoting *J.M. Rodriguez & Co. v. Moore-McCormack Lines, Inc.*, 32 N.Y.2d 425, 429 (1973)). "In other words, a party's breach and the loss caused is fixed and determined *when plaintiff's cause of action accrued*." *Id.* at 85–86 (emphasis added) (quotation omitted). The time of breach is the "time when the value to [plaintiff] of defendant's performance is to be measured because it was then that plaintiff was to be made whole." *Id.* at 86 (quotation omitted). Thus, New York courts generally "reject damages awards calculated with the benefit of hindsight." *Id.* Plaintiff has advanced a calculation that does not calculate damages from the alleged breach from the COI rate increase *as of the time it was implemented for each policy*, but rather assumes the pre-COI increase status quo was preserved in the intervening ten years. This allows plaintiff to know which insureds have died, a fact that was uncertain at the time of the alleged breach but has been made clear with hindsight. At the time of breach, Lite did not know whether the best course of action was to hold the policies and continue paying, to find a buyer for the (now more expensive) policies, or to simply let them lapse. Defendant has persuasively argued that the alleged damages in this case should recognize this uncertainty. Confronted with this argument, plaintiff has merely asserted that it does not seek money damages for policies where the insured is still alive and has not attempted to show how Mr. Glowacki's damages approach comports with New York law.

Second, by aggregating the policies together and including "negative" damages for the policies with still-living insureds, Glowacki's opinion ignores that plaintiff will have the burden to convince the jury that PHL breached *each individual* policy because of the COI rate increase. Plaintiff has not explained why under New York law its damages should not also be calculated as to each individual policy, nor why the 8 policies with "negative damages" would not fail on this element if Mr. Glowacki's calculation is to be believed.

In sum, Lite has not carried its burden to show that the Glowacki Report's measure of damages is cognizable under New York law and would assist the jury in determining damages, therefore I grant the defendant's motion to exclude the Glowacki Report in its entirety.

**Sandberg**

*1. Sandberg May Not Testify Regarding Dismissed Claims Relating to Grace Notices*

Plaintiff moves to dismiss the Sandberg Report on the grounds that his opinions are based on issues no longer involved in the case. Pl.'s Mem. in Supp. Mot. to Exclude Def.'s Experts 15 ("Pl.'s Mem."), ECF No. 103. Plaintiff notes the Sandberg Report primarily focuses on claims 1 and 3, which were dismissed by mutual consent. *Id.*; *see* ECF Nos. 83, 84 (dismissing all claims except those in Count 2 of the Complaint with respect to 13 policies).

In particular, plaintiff argues that Sandberg should not be allowed to opine on the issue of grace notices. Pl.'s Mem. 16. These notices are sent to a policyholder "specifying the minimum 'amount due' that need[s] to be paid to bring the policy out of default." Compl. ¶ 283. PHL's alleged inaccuracies in the grace notices were the subject of the now-dismissed third claim for relief. *See id.* ¶¶ 282–87. Defendant notes that portions of the Sandberg Report refer to the grace notices because that issue is still relevant to the reason why plaintiff contends it lapsed the policies—the grace notices conveyed an allegedly inappropriate COI rate increase. Def.'s Opp'n Pl.'s Mot. to Exclude 5 ("Def.'s Opp'n"), ECF No. 102. Defendant points to paragraphs in the Goldblatt Report that also discuss the grace notices. *Id.* at 6 (citing Goldblatt Report ¶¶ 10, 30, 36, 39, 49, 52, 56). Plaintiff addresses only paragraphs 10, 36, 39, and 56, contending that "the quoted paragraphs specifically state that the grace notices were what conveyed the now-disputed COI increases to the policyholders." Pl.'s Reply in Supp. Mot. to Exclude 5 ("Pl.'s Reply"), ECF No. 107.

I agree with Lite that Sandberg's opinions on whether the grace notices delivered by PHL breached the terms of the policies or harmed Lite are no longer helpful to the jury in determining

a fact in issue or understanding the evidence, and therefore that PHL has not carried its burden to admit Sandberg's testimony on these points. Fed. R. Evid. 702(a). I therefore exclude paragraphs 10, 57, and 64–71 of the Sandberg Report in their entirety, and paragraphs 6, 8, 9, and 11 of the Sandberg Report insofar as they discuss the issue of whether PHL breached the grace notices or whether the grace notices caused harm to Lite.

Second, I agree with PHL that the statements in paragraphs 10, 30, 49, and 52 of the Goldblatt Report also advance opinions about the propriety of the grace notices rather than simply noting they conveyed the COI rate increase and exclude them for the same reasons.

### 2. Sandberg is Qualified

David Sandberg is a member of the American Academy of Actuaries, a Fellow of the Society of Actuaries, and a Chartered Enterprise Risk Analyst. Sandberg Report ¶ 2. He has served as President of the American Academy of Actuaries and has worked in various other roles in the insurance industry for 35 years. *Id.* ¶¶ 2–4. Plaintiff challenges Mr. Sandberg's qualifications only insofar as he challenges the "motivations" of plaintiff's experts, contending he is not qualified to opine on their thought process in his rebuttal report. Pl.'s Mem. 16–17. Relatedly, plaintiff moves to exclude Sandberg's rebuttal of Glowacki's damages calculation because it "makes a false assumption" and misrepresents Glowacki's methodology. *Id.* at 18–20. Because the Sandberg Rebuttal only addresses the Glowacki Report, and I have concluded that Glowacki's testimony should be excluded, I find that the topics in the Sandberg Rebuttal will not be relevant to the jury and exclude them. Otherwise, I find that Sandberg is qualified by his background and experience to opine on all aspects of the Sandberg Report.

### 3. Sandberg's Background Testimony Is Admissible

Lite also argues that Sandberg's "background" testimony "consists of a string of hearsay assertions that do not sufficiently cite sources to allow the parties—or the Court—to determine

whether they are of the type normally relied on by experts." Pl.'s Mem. 16. PHL responds that Sandberg's opinion will assist jurors with understanding topics that a layperson may not be familiar with, including "the economics of life insurance, the secondary market for life insurance policies, . . . the distinctive features of [universal life] policies as compared to other life insurance, and reasons why consumers and investors choose to lapse universal life policies." Def.'s Opp'n 4. PHL points out that Lite has not identified which statements it believes are hearsay and could and did ask Sandberg what materials he relied upon in drafting his opinion. *Id.* at 7. Defendant also identifies sources cited by Sandberg throughout his background sections, the list of sources identified in Exhibit 3 to the Sandberg Report, and Mr. Sandberg's experience as supporting the "background" sections of his report. *Id.* at 7–9. Lite responds that PHL cannot use sources cited at the end of a series of paragraphs to support the entire series, and that, in any event, "background" information of this type is not the proper subject of expert testimony. Pl.'s Reply 5–6.

First, plaintiff has not identified any statement of Sandberg's that is "hearsay" as that term is defined by Federal Rule of Evidence 801(c), that is, an out-of-court statement offered in evidence to prove the truth of the matter asserted in the statement. Nor is plaintiff objecting to Mr. Sandberg basing his opinion on inadmissible facts or data. *See* Fed. R. Evid. 703. Rather, plaintiff seems to be using "hearsay" in a general sense to mean any assertion of fact it considers unsupported.

It is true that PHL bears the burden of demonstrating that Sandberg's "testimony is based on sufficient facts or data." Fed. R. Evid 702(b). PHL is also required to disclose "the facts or data considered by" Sandberg in forming his opinions as well as "any exhibits that will be used to summarize or support" the opinions. Fed. R. Civ. P. 26(a)(2)(B)(ii)–(iii). I conclude that defendant has satisfied both requirements with respect to the background sections in the Sandberg Report. Nothing in these two rules requires a formalistic, law journal-like citation of a source for each

proposition advanced by an expert; the Federal Rules of Evidence merely require the facts or data relied upon be "sufficient" and the Federal Rules of Civil Procedure require the facts or data considered to be "disclose[d]" within the expert's report. Fed. R. Evid. 702(b); Fed. R. Civ. P. 26(a)(2)(B)(ii). Nor do I see any problem with admitting these background sections primarily based on Sandberg's experience. The "background" sections cover topics such as: "The Economics and Basics of Life Insurance," "Temporary 'Term' Insurance and Permanent 'Whole Life' Insurance," "The Life Settlements Market," "Impact of Revised Mortality Expectations and the Financial Crisis (2008) on the Secondary Market," and "Impact & Motivations for Policy Lapsation – Consumers vs. Investors." *See generally* Sandberg Report 2–17. Sandberg has deep experience in the life insurance industry, which plaintiff has not contested. *See generally* Pl.'s Mem. In light of these considerations, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are enough for plaintiff to dispute Sandberg's opinions on the "background" materials in his report. *Daubert*, 509 U.S. at 596.

I turn next to plaintiff's contention that "[c]ourts in this [c]ircuit generally do not allow experts to testify for the purpose of providing a background narrative." Pl.'s Reply 4 (citing *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004). The proposition that background testimony from experts is disfavored in the Second Circuit appears nowhere in the cited portion of *In re Rezulin*, and this case does not stand for the proposition that experts cannot testify for the purpose of providing background. The issue in *In re Rezulin* was that the plaintiffs sought to admit testimony from an expert who would provide "nothing more than a repetition of the factual allegations in plaintiffs' complaint" and who plaintiffs effectively conceded was not giving expert testimony at all. 309 F. Supp. 2d at 551 & n.67. Plaintiff has not addressed defendant's point that a jury will have no background on relevant aspects of the life insurance industry, which Mr.

Sandberg's expertise will help them understand. I find that PHL has carried its burden to demonstrate that this testimony will assist the jury in understanding the evidence and reject plaintiff's attempt to represent to me that case law in the Second Circuit precludes this testimony.[8]

Finally, plaintiff argues that even if Sandberg's background testimony is admitted, "Pfeifer is just as qualified as Sandberg to testify to the various topics in Sandberg's 'background.' Having Pfeifer do so would make more sense than allowing Sandberg to testify as an expert only to the 'background' material." Pl.'s Reply 10 n.5. I reserve judgment on whether Sandberg's testimony would be needlessly duplicative or waste time until after the parties submit a pre-trial order, should this case reach that procedural posture.

### Pfeifer

Plaintiff does not dispute Mr. Pfeifer's qualifications. *See generally* Pl.'s Mem. Pfeifer has been an actuary for 40 years and has consulted on the "development, pricing, and marketing of life insurance and annuity products" for 35 years. Pfeifer Report ¶ 1. I conclude that Pfeifer is qualified to opine on the cost of insurance adjustment and background relating to universal life insurance policies and the life settlement industry.

#### 1.  Pfeifer's Background Testimony Is Admissible

The parties generally repeat the arguments concerning "hearsay" and "background" testimony that I have already covered with respect to the Sandberg Report. *See* Pl.'s Mem. 9–11; Def.'s Opp'n 13–20. Although plaintiff cites to Federal Rule of Evidence 703 when discussing Pfeifer's

---

[8] I also reject plaintiff's repeated assertion that because Lite "discussed *Rezulin* in its opening brief and PHL made no effort to address the case in its [r]esponse brief . . . PHL should be taken to have conceded this point." *E.g.*, Pl.'s Reply 4 (citing *Jones v. Cuomo*, 542 F. Supp. 3d 207, 216 n.2 (S.D.N.Y. 2021)). While true that where briefing fails to respond to an argument, I may consider that argument conceded, there is no basis to assert that failure to respond to an opposing party's citation of a case concedes all arguments relating to that case. Such a holding would be formalistic and inefficient for litigants, and I decline to find that PHL has conceded any argument merely because it did not cite *In re Rezulin* in its Opposition.

opinion, it does not identify any statement through which Mr. Pfeifer is introducing otherwise inadmissible facts, instead complaining that paragraphs 13–31, 32–34, and 36–53 of the Pfeifer Report "contain a recitation of mostly disputed factual allegations" without citing sources. Pl.'s Mem. 9. As previously discussed, not citing sources is not the same as introducing hearsay. Further, Exhibit 3 to the Pfeifer Report contains the list of Bates-numbered documents Pfeifer relied upon in drafting the report, and defendant's briefing cites extensively to portions of Mr. Pfeifer's deposition during which Lite investigated the basis for his assertions, including the documents upon which he relied. *See* Def.'s Opp'n 15–20. Nor could expert testimony be limited only to "undisputed facts," since an expert's role is to assist a jury in determining facts in issue. *See* Fed. R. Evid. 702. After reviewing each of the statements identified by plaintiff, I conclude that they have sufficient factual support to comply with the requirements of Federal Rule of Evidence 702(a) and Federal Rule of Civil Procedure 26(a)(2)(B)(ii).

## 2. *Pfeifer May Not Offer Testimony on Contract Interpretation*

Plaintiff argues that the Pfeifer Report contains improper opinions on legal issues including the interpretation of disputed policy terms. Pl.'s Mem. 11–12 (citing Pfeifer Report ¶¶ 34, 37, 45, 46 and Pfeifer Suppl. Report ¶¶ 7–9). The interpretation of a contract term, unless it is found ambiguous, is generally a question of law. *See New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir. 2006) ("[U]nder New York law, the interpretation of an unambiguous contract is a question of law. However, if the contract is ambiguous and relevant extrinsic evidence as to its meaning is available, its interpretation is a question of fact for the factfinder." (citations omitted)). However, most of the paragraphs challenged by Lite do not raise concerns that Pfeifer is interpreting the policies. For instance, paragraph 34 says that PHL's policies "provide it with the contractual right to change current COIs," which plaintiff does not dispute. Pfeifer Report ¶ 34; Compl. ¶ 22 (noting the at-issue "limitation on PHL's *right* to increase

26

the Cost of Insurance rate" (emphasis added)); *see also* Pfeifer Rebuttal ¶ 7 (providing that the "contract language in the policies at issue specifically provides for the potential for adjustments to COI rates"); *id.* ¶ 8 ("[T]he contractual language confirm[s] that the current COI rate scales is adjustable."). Similarly, paragraph 37 states that "[e]ffective for anniversaries on or after November 1, 2011, PHL elected to change COI rates on PAUL IIIa, b, and c contracts, as permitted by language in the policy form." Pfeifer Report ¶ 37; *see* Compl. ¶ 258 ("In 2010 and 2011, PHL notified a subset of its PAUL policyholders that it intended to increase the COI rates applicable to their policies. It told these policyholder[s] that this increase would take effect on their next policy anniversary date.").

Further, the opinions in paragraph 46 of the Pfeifer Report and paragraph 9 of the Pfeifer Rebuttal are within Pfeifer's expertise and merely embrace the "ultimate issue" of whether the rate increases were unfair. Paragraph 46 notes that (1) "[t]he COI contractual provisions in the PAUL contracts were generally typical of the types of language seen in the industry during that time," (2) the "provisions did not obligate PHL . . . to provide detailed information as to the assumptions and methods employed" for the COI increases, (3) "state regulators have not required life insurers to provide disclosures to policyholders" about how insurers determine COI changes, and (4) PHL and competitors "have the discretion to adjust COI charges based upon the factors identified in the contract." Pfeifer Report ¶ 46. None of these statements is disputed, and Pfeifer is well-qualified to opine on industry standards. Although Pfeifer also discusses how the language in PHL's policies is "intentionally broad," and "more extensive" than the factors listed by competitors, these opinions do not interpret the policies. *See id.* Similarly, paragraph 9 of the Pfeifer Rebuttal merely acknowledges that PHL's methodology for the COI rate change should "tak[e] into account

27

contractual language . . . [this] component[] [is an] important element[] of any change in universal life non-guaranteed element revisions," which is not a contested proposition. Pfeifer Rebuttal ¶ 9.

Paragraph 45 opines that "PHL's changes . . . are consistent with the contractual language, in my opinion." Pfeifer Report ¶ 45. This is tantamount to a conclusion that PHL did not breach the terms of the policies and is an improper legal conclusion. Accordingly, I exclude Pfeifer from testifying to the "consistency" or "compliance" of the COI rate increase with the underlying policies. *E.g. id.* ¶ 47 (describing the COI rate increase as "compliant with PHL's policy contracts"). I also exclude any testimony that PHL did not "violate" the terms of the policy as going to the legal question of contract interpretation. *E.g. id.* ¶ 7 ("The policy form language relevant to COI rate changes was not violated by PHL's COI [a]djustment.").

### 3. *Pfeifer's Actuarial Opinion Is Not an "Ultimate Issue"*

Returning to an issue discussed with respect to Goldblatt's opinion, plaintiff insists that the question of "[w]hether or not the discrimination [in raising COI rates] was fair . . . is a legal question" that Pfeifer cannot opine on. Pl.'s Mem. 12. Although testimony on this front might embrace an "ultimate issue," I am persuaded that the definition of "unfair" discrimination is an actuarial question upon which Mr. Pfeifer may opine. The same logic applies to plaintiff's insistence that Pfeifer cannot opine that the COI rate changes were "reasonable."

On reply, plaintiff argues that if I allow Pfeifer's testimony, it would be "confusing to the jury because Pfeifer's proposed testimony is using words and phrases that are remarkable [*sic*] similar to the words and phrases that the jury will be called on to decide." Reply 13. According to plaintiff, "[t]his danger is especially high" because the *Fleisher* court "found that at least some of the contract provisions are ambiguous and must be construed against the insurance company." *Id.* (emphasis omitted) (citing *Fleisher*, 18 F. Supp. 3d at 473–74). I do not see how the jury will be unduly confused by the similar language, or how any potential confusion could not be remedied

by a jury instruction. Plaintiff has not convinced me that the risk of jury confusion "substantially outweigh[s]" Pfeifer's highly probative testimony on the actuarial meaning of "unfair discrimination." Fed. R. Evid. 403.

### 4.  *Pfeifer's Principles and Methodology Are Reliable*

Plaintiff also challenges Pfeifer's methodology for concluding that the COI rate increase did not constitute "unfair discrimination," arguing that Pfeifer "engages in lawyerly argument and non-expert handwaving to arrive at the conclusion that there was not unfair discrimination" and faulting him for excluding "calculations, recitations from treatises, or interpretations of complex actuarial procedures or policies" from his report. Pl.'s Mem. 13. Because he "performs no math and no calculations," nor does he "assess any alternative approaches to the COI increase or perform any comparison among options PHL could have used to form its [policy] classes," plaintiff argues the Pfeifer Report should be excluded. *Id.* at 14–15.

Although Lite's arguments on this point are conclusory, my gatekeeper role requires that I analyze the Pfeifer Report and other materials provided by PHL to ensure that Pfeifer's testimony "is the product of reliable principles and methods." Fed. R. Evid. 702(c). In doing so, I am not "require[d] . . . to admit opinion evidence that is connected to existing data only by the *ipse dixit* of" Mr. Pfeifer and may instead conclude "that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

The Pfeifer Report begins with a discussion of universal life products generally, including their pricing mechanisms, their flexible premium payment schedule, the mechanics by which they lapse, and whether they are designed with investor-owners such as Lite (vs. original insureds) in mind. Pfeifer Report ¶¶ 13–20. Pfeifer then discusses PHL's universal life products, the fact that they "were generally targeted to provide attractive cash accumulation features," their common terms across series, and the history of their policy revisions. *Id.* ¶¶ 21–31. Pfeifer notes that there was a

"relatively large number of changes in the PAUL product suite" prior to the at-issue rate increases. *Id.* ¶ 28. Although Pfeifer does not explain what facts lead to this conclusion, each of the described changes occurred years before the COI rate increases and I understand this statement to be background information. Pfeifer concludes this section by noting that the "non-guaranteed elements are very typical for a [universal life] contract like the PAUL series contracts." *Id.* ¶ 31. This conclusion is well-supported by Pfeifer's industry experience.

Pfeifer next discusses COI rate adjustments generally, noting the undisputed facts that (1) the development of the 2001 Valuation Basic Table by the American Academy of Actuaries was "the most current mortality pricing table during this time period," (2) the underlying policies allowed PHL to change COI rates, and (3) the policies were originally based on the 1980 Valuation Basic Table. *Id.* ¶¶ 32–34. Pfeifer then notes that in determining whether to change rates, PHL is "guided by" ASOP 2 and its guidance. *Id.* ¶ 35. Pfeifer summarizes ASOP 2 as "stat[ing] that changes to non-guaranteed elements [such as COI rates] should be based upon changes in expectations of future relevant experience and applied consistently to the affected classes." *Id.* Again, I see no "analytical gap" or other concern with Pfeifer's opinion as to these points.

Pfeifer then states that PHL's "[a]nticipated experience as to future lapse rates and mortality differed from those at the time of original pricing," which "were generally . . . detrimental to future profit projections." *Id.* ¶ 36. He also notes that PHL experienced "a divergence of original expectations regarding policy funding levels from actual experience"—PHL had discerned that for certain age bands, "the premium funding patterns would be heavily dominated by a pattern" in which there were higher premiums paid in "Policy Year 1, followed by the minimum premium needed to keep the contract inforce in subsequent years." *Id.* Pfeifer concludes that considering the "persistency of premium funding was appropriate." *Id.* Pfeifer concludes that the changes based

on PHL's new rates and assumptions resulted in profit projections "approximately equal" to PHL's original profit projections. *Id.* ¶¶ 37–39. These conclusions flow directly from Pfeifer's experience and, presumably, from the underlying PHL documents he reviewed concerning the rate increase.[9]

After describing further background on the policies and the rate increase, Pfeifer describes the "analytical approach used by PHL to develop the level of the COI adjustment," which involved comparing PHL's original profitability projections and pricing assumptions to a model with "revised future pricing assumptions" based upon "potential new COIs" that "were calibrated so as to generate future profitability that would approximate, but not exceed, the original [p]resent [v]alues of [p]rofits first calculated." *Id.* ¶ 47. Pfeifer then opines that "[a]lthough there could be other reasonable approaches to deriving the COI increase percentage, in my opinion, this 'dollar amount of profits' approach is actuarially reasonable, compliant with PHL's policy contracts and consistent with the [d]etermination [p]olicy established by the [c]ompany." *Id.* I do not see any "analytical gap" in Pfeifer's explanation that the "dollar amount of profits approach is actuarially reasonable," as he is qualified to opine on the actuarial reasonableness of rate adjustments based on his experience and interpretation of ASOP 2, and plaintiff does not challenge his characterization of PHL's approach to determining the rate increase.

Finally, Pfeifer opines that PHL's "methodology and expectations of future experience" in raising COI rates "were reasonable," and that "[t]he rationale and implementation of these increases, in [his] opinion, were consistent with the language in the policy forms, and with [PHL's] [d]etermination [p]olicy." *Id.* ¶¶ 49, 52. He also opines that "PHL's actuaries developed the COI

---

[9] As discussed *supra*, the fact that Pfeifer does not cite sources after each proposition is not fatal to the admissibility of his opinion, and Lite does not challenge Pfeifer's description of PHL's "divergence of original expectations" or its conclusions regarding premium funding patterns. *See generally* Pl.'s Mem.

adjustments . . . in compliance with ASOP 2" and that "[t]he changes were not unfairly discriminatory within members of the class and did not recoup past losses or distribute prior gains." *Id.* ¶ 52. Pfeifer then explains how PHL's approach followed specific sub-provisions ASOP 2. *Id.* ¶ 53. Again, these opinions are within Pfeifer's experience as an actuary, and I do not see any flaws in his methodology that are so substantial as to prevent Mr. Pfeifer from testifying. Accordingly, I will admit Mr. Pfeifer's anticipated testimony.

## CONCLUSION

In light of the foregoing, I grant in part and deny in part PHL's motion to exclude the testimony of Lite's expert Raymond Goldblatt, grant PHL's motion to exclude the testimony of Lite's expert Kevin Glowacki, grant in part and deny in part Lite's motion to exclude the testimony of PHL's expert David Sandberg, and grant in part and deny in part Lite's motion to exclude the testimony of PHL's expert Timothy Pfeifer.

The parties are hereby directed to propose a joint summary judgment briefing schedule by no later than seven days of the date of this opinion, on or before December 12, 2022.

SO ORDERED.


Dated:  December 5, 2022          ___s/_____
        Brooklyn, NY             Allyne R. Ross
                                 United States District Judge