UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                     :

ISAAC JAKOBOVITS, as Trustee of the LITE
TRUST I,                           :          17-CV-3527-ARR-RER

            Plaintiff,        :

   -against-             :          **OPINION & ORDER**

PHL VARIABLE INSURANCE COMPANY,    :

            Defendant.      :

------------------------------------------------------------------- X

ROSS, United States District Judge:

Before me are the parties' cross-motions for summary judgment concerning the alleged breach of thirteen life insurance policies (the "Policies"). Defendant PHL Variable Insurance Company ("PHL" or "PHLVIC") moves for summary judgment on all claims brought by plaintiff Isaac Jakobovits, Trustee of the Lite Trust I (together, "Lite"). Lite moves for partial summary judgment on the issue of whether the Policies were breached.[1] For the reasons set forth below, I grant summary judgment to defendant.

---

[1] Also before me is the parties' joint motion to file certain exhibits with redactions. *See* ECF No. 119. The information to be redacted has been designated confidential under the protective order in this case. *See* ECF No. 45. I have reviewed the redactions and conclude that they cover either confidential business information belonging to defendant, including financial terms of the Policies, or personally identifying/health information of the insureds. I further conclude that although the Policies are "relevant to the performance of the judicial function and useful in the judicial process" and are therefore "judicial documents" for which there is a presumption of public access, *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (quotation omitted), the redacted portions do not contain any disputed material and the at-issue policy provisions remain unredacted, so the presumption of access to the redacted portions bears very little weight, *see United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995) (factors to be considered include "the role of the material at issue in the exercise of Article III judicial power"). Accordingly, the joint motion to file certain exhibits with redactions is granted.

# BACKGROUND

## I.      Evidentiary Disputes

Before summarizing the facts, I first address the parties' disputes over the admissibility of evidence which, if admissible, would bear on whether summary judgment should be granted. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

### A. Donovan Declaration Is Admissible

Lite argues that much of PHLVIC's Local Rule 56.1 statement relies upon the putatively inadmissible Declaration of Michael Donovan and asks that I either disregard the declaration or strike it. *See* Pl.'s Mem. in Opp'n Def.'s Mot. Summ. J. 14–16 ("Pl.'s Opp'n"), ECF No. 115-16; Decl. of Michael Donovan in Supp. Def.'s Mot. Summ. J. ("Donovan Decl."), ECF No. 115-3. Plaintiff contends that the Donovan Declaration was created solely for summary judgment and was not produced in discovery, contains assertions that should have been disclosed during Donovan's deposition, and is inconsistent with other material produced in discovery. *See* Pl.'s Opp'n 14–15.

Plaintiff has not shown that the Donovan Declaration is inadmissible or should be stricken. Unlike the cases cited by plaintiff, the "sham issue of fact" doctrine does not apply under these circumstances. That doctrine "prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony," thereby creating a fact issue that must be resolved at trial. *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014) (quotation omitted) (collecting cases). Here, PHL uses the Donovan Declaration to support its contention that there are no material disputes of fact, not to create a factual issue. *See generally* Def.'s Local Rule 56.1 Statement in Supp. Mot. Summ. J. ("Def.'s 56.1"), ECF No. 115-2 (citing Donovan Declaration 19 times).

2

The Federal Rules of Civil Procedure permit the use of declarations in support of a motion for summary judgment if the declaration "[1] [is] made on personal knowledge, [2] set[s] out facts that would be admissible in evidence, and [3] show[s] that the . . . declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Plaintiff has not attempted to show that none of these requirements are met, nor could it. The Donovan Declaration sets forth that it is made on Mr. Donovan's personal knowledge based on a review of PHLVIC's documents, explains that Mr. Donovan is the Chief Actuary of PHLVIC, and Mr. Donovan could testify to all of the information contained in the Donovan Declaration at trial. Donovan Decl. ¶ 1; *see* Fed. R. Evid. 602.

Further, plaintiff has not explained why the information contained in the Donovan Declaration should be excluded as a discovery sanction. Although Lite contends that Donovan "had ample opportunity during and after his deposition to provide this information," Pl.'s Opp'n 15, *plaintiff* deposed Mr. Donovan both in his individual capacity and as a Rule 30(b)(6) witness. *See* Decl. of Erik Dykema in Opp'n Mot. Summ. J. ("Dykema Opp'n Decl."), Ex. 5 at 5:10–18 ("Donovan Tr."), ECF No. 115-23 (MR. DYKEMA: "And it's my understanding that you are here today in a bit of a dual capacity, I'll say. You've been noticed up for your own personal deposition, but you're also here on what we will call a 30(b)(6) deposition, where you're basically the witness for the company. Is that your understanding as well?" MR. DONOVAN: "Yes."). Plaintiff had ample opportunity to elicit all of the information contained in the Donovan Declaration during his deposition and has not explained how defendant "fail[ed] to provide information . . . as required by [Federal Rule of Civil Procedure] 26(a) or (e)," such that exclusion of the Donovan Declaration is the proper remedy. *See* Fed. R. Civ. P. 37(c)(1) (sanction for failure to disclose is exclusion of that information). Nor has plaintiff identified a question Mr. Donovan failed to answer during the deposition that is answered by his Declaration.

Finally, the only purported inconsistency between Donovan's deposition and his Declaration is plaintiff's contention that Mr. Donovan testified that "premium persistency" was "a key driver and a primary example of where [d]efendant's pricing assumptions and experience diverged" but his declaration states that "the 2011 [cost of insurance] rate increases [at issue] were not contingent on accumulation values," a related issue. *See* Pl.'s Opp'n 15 (citing Donovan Decl. ¶ 9 and Donovan Tr. at 25:13–17, 29:13–31:14, and 34:8–22). Plaintiff simply ignores that the Donovan Declaration concedes that "there was a change in expectations for future premium funding levels [*i.e.*, premium persistency] at higher ages and higher face amount policies" and that PHL increased the COI rate on the policies "[i]n view of these updated expectations." *See* Donovan Decl. ¶ 8. The information plaintiff contends is missing is readily admitted, and therefore I find that there is no inconsistency between Mr. Donovan's testimony and his Declaration.

### B. Plaintiff May Not Rely on Expert Opinions from Prior Action

Defendant objects to plaintiff's reliance upon expert reports from Larry Stern and Douglas French, which are cited by plaintiff both in opposing defendant's motion for summary judgment and in support of its own motion. *See* Pl.'s Mem. in Supp. Mot. Summ. J. 15, 19, 25 ("Pl.'s Mem."), ECF No. 116; Pl.'s Opp'n 17, 18, 21 n.10, 24, 25. These two experts provided opinions in a related case involving a PHLVIC affiliate, *Fleisher v. Phoenix Life Ins. Co.*, No. 11-CV-8405 (CM) (S.D.N.Y.), and defendant objects to their use in this action because Lite failed to designate either as an expert and provide their reports prior to its summary judgment filings. Lite contends that it "is not offering the documents as expert testimony," but rather cites them only "for the facts discussed therein." Pl.'s Reply in Supp. Mot. Summ. J. 3 ("Pl.'s Reply"), ECF No. 118. Lite also argues that Mr. French was the defense expert in *Fleisher*, and that it is entitled to use his public statements from another case to support its contentions. *Id.* at 8.

4

I will not permit plaintiff to rely on expert reports from another case. It is obvious that plaintiff relies on both experts to support its interpretations of relevant provisions of the Policies and to support Lite's theory of breach, not merely for the facts conveyed therein. *See, e.g.*, Pl.'s Opp'n 18 (citing Stern's report for industry interpretation of the term "class of insureds"); *id.* at 21 n.10 (citing Stern's report for industry interpretation of the term "persistency"); *id.* at 24 (citing French's report for description of manner in which COI rate increase was calculated); Pl.'s Mem. 25 (citing Stern's report for proposition that PHLVIC impermissibly recouped past losses with the COI rate increase).

Plaintiff does not deny that it did not designate these individuals as experts by the applicable deadline in this case. Def.'s Mem. in Opp'n Mot. Summ. J. 11 ("Def.'s Opp'n"), ECF No. 117; Pl.'s Reply 8 ("Defendant complains that Lite failed to designate Mr. French as an expert in this case. Of course, Lite would not have done so, because Mr. French was [d]efendant's expert in the prior case."). Prior to the motions for summary judgment, the parties extensively litigated the issue of expert qualification and what expert opinions may be elicited in this action; plaintiff never mentioned its intention to use the French or Stern reports from *Fleisher* during this process. *See generally* Dec. 5, 2022 Op. & Order, ECF No. 110. Moreover, in this case, Judge Reyes has sanctioned plaintiff for failure to comply with its discovery obligations, ordering that "[p]laintiff is preclude[ed] from offering into evidence at summary judgment or trial *any documents, from any source*, not produced during discovery." May 3, 2022 Docket Order (emphasis added).

Plaintiff has not explained why it failed to submit additional expert disclosures by the deadline in this case, despite the fact that it is now relying upon Stern's and French's opinions. Nor has plaintiff explained why I should consider these reports notwithstanding Judge Reyes'

order, which applies to unproduced documents from any source. The proper sanction for failure to identify these experts is exclusion. *See* Fed. R. Civ. P. 37(c)(1).

## II.    Factual Background

The following facts are taken from the parties' filings, depositions, declarations, exhibits, and respective Local Rule 56.1 statements of facts; where a Rule 56.1 statement is cited, that fact is either undisputed or the opposing party has not pointed to any evidence in the record to contradict it. *See* Fed. R. Civ. P. 56(c); E.D.N.Y. Local Civil Rule 56.1(c). Citations to a party's Local Rule 56.1 statement incorporate the evidentiary materials cited therein.

The Policies are universal life insurance policies issued by defendant in 2007 and 2008 known as Phoenix Accumulator Universal Life ("PAUL") polices. Def.'s 56.1 ¶¶ 1, 2. The PAUL products have flexible premium requirements, meaning that the policyholder may choose how much premium to pay monthly, or not pay at all. Pl.'s Local Rule 56.1 Statement in Supp. Mot. for Summ. J. ("Pl.'s 56.1") ¶¶ 3, 5, ECF No. 116-1; *see also* Def.'s Local Rule 56.1 Statement in Opp'n Mot. for Summ. J. ("Def.'s 56.1 Opp'n") ¶ 5, ECF No. 117-1 (disputing the relative importance of flexible premium payments to the product but agreeing that "the policyholder may choose how much premium to pay"). Premiums paid increase the "accumulation value" of each policy, Def.'s 56.1 ¶ 2, and the monthly premium is deducted from the accumulation value if the policyholder elects not to pay the premium, Pl.'s 56.1 ¶ 5. Monthly cost of insurance ("COI") charges are also deducted from the accumulation value. Def.'s 56.1 ¶ 3. The COI charge is determined based on a COI rate, which can be adjusted by PHLVIC in accordance with the terms of the Policies. *Id.* ¶ 4. Different insureds may have different COI rates if they are not the same age, differ in PHLVIC's internal "Risk Classification," if their coverage began at different times, or because of the amount of coverage purchased. *Id.* ¶¶ 11–12; *see also* Pl.'s Local Rule 56.1 Statement in Opp'n Mot. for Summ. J. ("Pl.'s 56.1 Opp'n") ¶ 12, ECF No. 115-17 (disputing the

6

paragraph but agreeing that the testimony cited by defendant "purports to show that two otherwise identical policies having different face values might have different COI rates"). PHLVIC maintained COI rate tables for the PAUL policies for each sex and Risk Classification. Def.'s 56.1 ¶¶ 14–15.

The Policies all permit PHLVIC to "re-determine Cost of Insurance rates . . . on a basis that does not discriminate unfairly within any class of insureds." *Id.* ¶ 19. PHLVIC is also required to "determine[] prospectively" any rate changes and is prohibited from "distribut[ing] past gains or recoup[ing] prior losses . . . by changing the rates." *Id.* PHLVIC must also determine rates "based on [its] expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions." *Id.* ¶ 10.

In 2011, PHLVIC increased COI rates on certain PAUL policies, including the Policies at issue in this case. *Id.* ¶ 21. Each of the Policies ultimately lapsed. *Id.* ¶¶ 49, 53. The COI rate increase applied to policies within the "PAUL IIIa" series where the insureds were age 68 and above and the insurance face amount was $1 million or more, and to policies within the "PAUL IIIb" and "PAUL IIIc" series where the insureds were age 65 and above and the insurance face amount was $1 million or more. *Id.* ¶¶ 28–29.

The parties diverge on PHLVIC's motivation for increasing COI rates. PHLVIC characterizes the change as "necessary," part of its practice of "regularly assess[ing] the developing experience in its PAUL products," and the result of "[a]nalysis show[ing] that PHLVIC's anticipated experience for future lapse rates [*i.e.*, the proportion of policies that would continue to remain in force] and mortality differed from what was assumed when the [Policies] were originally priced." *Id.* ¶¶ 21, 22, 24. PHLVIC also identified "a change in the expectations for future premium funding levels at higher ages and higher face amount policies that had an

impact on PHLVIC's future profitability projections." *Id.* ¶ 25. Defendant claims that it calculated a COI rate increase "[i]n the view of these updated expectations" and projected its future earnings "to determine the rate increase needed to bring projected future profitability up to (but no[t] exceeding)" the projected profitability of the Policies when originally issued. *Id.* ¶ 26.

Lite contends that the at-issue COI rate increase and COI rate increases relating to other PAUL series[2] were designed and executed in order to induce "life settlement" investors, that is, secondary purchasers of life insurance policies such as Lite, to forego premium payments and allow the policies to lapse. *E.g.* Pl.'s 56.1 ¶ 22 (citing internal email suggesting delay in COI rate increase to PAUL II series so that any rate increase would "truly be hurting the policyholders that have already settled"); *id.* ¶ 25 (citing correspondence suggesting attempt to "catch" policies exhibiting funding patterns associated with life settlement investors). Accordingly, plaintiff contends that PHLVIC considered "premium funding characteristics" as part of defining the class of policies to which the COI rate increase would apply. *Id.* ¶ 30. In short, plaintiff believes that PHLVIC "specifically targeted the investor-owned policies" with the 2011 COI rate increase. *Id.* ¶ 34.

Following stipulations, *see* ECF Nos. 83, 84, the sole remaining claim in this case is plaintiff's claim for breach of the Policies relating to the COI rate increase.

## LEGAL STANDARDS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[2] PHLVIC generally objects to the use of evidence relating to COI rate increases applicable to *other* PAUL policy series as irrelevant to the COI rate increase at issue. However, such evidence is marginally relevant to, *e.g.*, PHLVIC's corporate approach to determining COI rate increases and the state of mind of its employees, and I will consider it as needed.

56(a). The function of the court at this juncture is not to resolve disputed issues but rather to determine whether there is a genuine issue to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In determining whether a genuine issue of material fact exists, "[t]he evidence of the nonmovant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party. *Id.* at 255 (citation omitted). "In reviewing the evidence and the inferences that may reasonably be drawn, [I] may not make credibility determinations or weigh the evidence. . . . Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 607–08 (2d Cir. 2017) (omission in original) (citations and internal quotation marks omitted). "While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, . . .  materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quotation omitted).

Once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The moving party "may obtain summary judgment by showing that little or no [admissible] evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir. 1994); Fed. R. Civ. P. 56(c)(1)(B). The nonmovant "may not survive summary judgment merely by conjuring a hypothetical issue of material fact." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015). In other words, the nonmoving party

"must do more than simply show that there is some metaphysical doubt as to the material facts[] and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citations and internal quotation marks omitted).

## I.     Putative Choice of Law Issue

Throughout its briefing, plaintiff cites provisions of the New York Insurance Law as controlling. *See, e.g.*, Pl.'s Mem. 4 n.3 (contending that the contractual factors upon which PHLVIC could raise COI rates was "further limited by New York law" (citing N.Y. Ins. L. § 4232(b)(2)); *id.* at 16 (citing New York General Counsel opinions concerning the interpretation of a "class of insureds" under New York law); *id.* at 17 (contending New York law prohibits incorporating Actuarial Standards of Practice into the Policies (citing N.Y. Ins. L. § 3204(a)(1)); Pl.'s Opp'n 19 (contending PHLVIC violated New York law by failing to follow the guidelines of its board of directors (citing N.Y. Ins. L. § 4232(b)(4)). Defendant argues that plaintiff inappropriately assumes that the New York Insurance Law guides interpretation of the Policies.

Although plaintiff states that "[i]t is undisputed that the policies are governed by New York law," Pl.'s Mem. 12, defendant argues that New York's statutory insurance laws do not apply to the Policies or restrict their interpretation.[3] PHLVIC is a Connecticut corporation with its principal

---

[3] In discussing this issue, defendant notes that plaintiff's counsel appears to have copied, with some alterations, from the plaintiff's summary judgment briefs in *Fleisher*. *See* Def.'s Opp'n 12 & n.10 (noting similarity in language between briefs and quotation of policy term that does not exist in a policy in this case); *id.* at 19 (contending that Lite seeks summary judgment on a theory of breach of contract that it did not plead because this theory was litigated in *Fleisher*). Certain exhibits cited by plaintiff were taken directly from the docket in *Fleisher*. *E.g.* Dykema Opp'n Decl., Exs. 2, 5, 8, ECF Nos. 115-20, 115-23, 115-26; Dykema Decl., Exs. 1, 2, 4, ECF Nos. 116-4, 116-5, 116-7. Although *Fleisher* concerned similar COI rate increases and the defendant was an affiliate of PHLVIC, it differed because (1) the interaction of the defendant in *Fleisher* and the New York State Insurance Department ("NYSID") was at issue, *see Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 466–67 (S.D.N.Y. 2014), and (2) the circumstances of a 2010 COI rate increase on other PAUL policy series was at issue, *see id.* at 465. Although I have no reason to doubt that plaintiff's counsel in *Fleisher* conducted a reasonable inquiry into the facts of its case and that its factual contentions had evidentiary support, plaintiff's counsel in this case is reminded

place of business in Hartford, Connecticut. Am. Compl. ¶ 9, ECF No. 12; Def.'s Answer ¶ 9, ECF No. 39. The Policies were issued in Minnesota.[4] *See* Def.'s 56.1 ¶ 37. A review of the life insurance applications underlying the Policies reveals that no original insured or original policyholder had a New York address at the time the insured applied for life insurance. *See* Decl. of Erik Dykema in Supp. Mot. Summ. J. ("Dykema Decl."), Exs. 64–76, ECF Nos. 116-69–116-81.

Plaintiff accuses PHL of "rais[ing] this argument for the sole purpose of muddying the waters," noting that defendant cites New York case law in support of its positions. Pl.'s Reply 4. This is a misinterpretation; PHL does not believe that there is any material conflict between Minnesota and New York law "[a]s it pertains to the elements of a breach of contract claim and contract interpretation," rather it objects to Lite's arguments that New York's statutory scheme regulating insurance should constrain how the policies are interpreted. Def.'s Opp'n 12.

Diversity of citizenship is the basis for my jurisdiction in this case, so I apply the conflict of laws rules of New York to a putative conflict. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941) (federal courts with diversity jurisdiction apply conflict of law rules of forum state). For contract claims such as this, New York law directs me to "apply the 'center of gravity' or 'grouping of contacts' analysis, which looks at the contacts between the disputed contract and the relevant states," including such factors as "the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties." *Cotiviti, Inc. v. Deagle*, 501 F. Supp. 3d 243, 256 (S.D.N.Y. 2020) (quoting *In re Allstate*

---

that litigants have an independent obligation to conduct this inquiry under Rule 11(b). I have not considered any of plaintiff's arguments relating to NYSID or the 2010 COI rate increases as they are irrelevant to this case.

[4] Plaintiff disputed this fact in its Rule 56.1 Counterstatement of Material Facts but did so only on the basis that the Donovan Declaration is inadmissible. *See* Pl.'s 56.1 Opp'n ¶ 37.

*Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 226–27 (1993)). At the time the Policies were entered into, there was absolutely no connection between New York and PHLVIC, the insureds, or the policyholders. Indeed, the only connection between the Policies and New York is that a New York investor, Lite, ultimately purchased the Policies. *Compare In re Allstate Ins. Co.*, 81 N.Y.2d at 227 (holding New Jersey law governed interpretation of auto insurance policy sold by New Jersey company to New Jersey insured even where New York citizen was an additional insured involved in an automobile accident). Accordingly, I will not apply the New York Insurance Law in interpreting the policies. Because I am aware of no conflict between New York law governing general contract interpretation and the elements of plaintiff's claims for breach, I will apply New York law on these questions.

## II.    Applicable Law

To demonstrate a breach of contract, plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (citation omitted). "Under New York law, insurance policies are interpreted according to general rules of contract interpretation." *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 98 (2d Cir. 2012). "[T]he words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Id.* at 99 (quotation and alteration omitted). A policy term is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996) (quotation omitted). If after considering extrinsic evidence of the parties' intent at formation of the contracts the term is still ambiguous, I may apply

12

New York's *contra proferentem* rule, which resolves ambiguities in favor of the insured. *See Olin Corp.*, 704 F.3d at 99.

Plaintiff advances three theories of breach of the Policies: (1) that the COI rate increase improperly recouped prior losses and that PHLVIC failed to determine its rate increase "prospectively;" (2) that PHLVIC relied upon factors beyond the six enumerated in the Policies to determine the rate increase; and (3) that PHLVIC "discriminate[d] unfairly within [the applicable] class of insureds."

## DISCUSSION

### I.   Plaintiff Lacks Admissible Evidence that the Rate Increase Recouped Prior Losses

Plaintiff contends that the COI rate increase violated the requirement that increases be "determined prospectively" and not "distribute past gains or recoup prior losses." Pl.'s Mem. 24–25. In plaintiff's telling, this term means that PHLVIC could not calculate its COI rate increase based on any "revised assumptions" from the issue date of the Policies and could only project its future profitability "as of the current policy duration." *Id.* at 25 (citing Pl.'s 56.1 ¶ 47). In support of this interpretation, plaintiff cites a letter from PHLVIC's affiliate, Phoenix Life Insurance Company ("PLIC"), to NYSID, representing that PLIC "used new assumptions only from the point of the COI increase and not back to the original issue date." *See* Pl.'s 56.1 ¶ 47; Dykema Decl., Ex. 16 ("PLIC Ltr."), ECF No. 116-19.

Plaintiff argues that "discovery has revealed that PHL's representations to the insurance regulators were false" because "PHL 'used updated premium persistency assumptions from date of issue while updated lapse and mortality assumptions were used starting from the current policy duration forward.'" Pl.'s Mem. 25 (quoting Pl.'s 56.1 ¶ 44). As evidentiary support for this

contention, plaintiff cites the French expert report. *See* Dykema Decl., Ex. 59 ("French Report") ¶¶ 68, 75, ECF No. 116-64.

Defendant objects to the use of materials from *Fleisher* because they are from a different corporate entity and relate to different rate increases, as well as to the use of the French Report. Def.'s Opp'n 21–22. On the merits, PHLVIC argues that its actuarial expert, Tim Pfeifer, reviewed its documentation concerning the rate increase and testified to his opinion that these increases "were prospective and did not recoup prior losses." *Id.* at 21. I previously excluded Lite's actuarial expert from opining that the COI rate increase recouped prior losses, *see* Dec. 5, 2022 Op. & Order 8, and defendant argues that because I have done so, Lite has no evidence creating a material dispute of fact as to whether the rate increase did not recoup prior losses.

Plaintiff's base assumption is that the statement of an affiliate company of defendant, but not defendant itself, to an insurance regulator is an authoritative interpretation of the Policies. This is flawed. As I have already ruled, these Policies bear no connection to New York, and I do not see how a statement from a non-party to an insurance regulator whose regulatory regime does not reach the Policies could possibly be relevant to this case. Further, plaintiff has not demonstrated why the out-of-court statement of PHLVIC's affiliate constitutes PHLVIC's own statement. *See* Fed. R. Evid. 801(d)(2) (listing circumstances in which an opposing party statement is not hearsay). Even if this statement were admissible, the portion of the PLIC Letter quoted by plaintiff does not interpret the Policies. Instead, it represents to the New York Insurance Department that its *methodology* in calculating the COI rate increase includes "new assumptions only from the point of the COI increase and not back to the original issue date" and, separately, that "[PLIC] constructed a COI rate increase . . . such that the present value of profits from this point forward using the new assumptions approximate, but did not exceed, the present value of profits from this

14

point forward using original assumptions." PLIC Ltr. 2. At no point does the PLIC Letter endorse
Lite's interpretive position that, in order for future projected profits to "approximate, but . . . not
exceed" original projected profits, PLIC *must* rely on "new assumptions only from the point of the
COI increase." *Id.*

Even if the PLIC Letter creates a binding interpretation of the Policies, plaintiff's next
contention—that the French Report contradicts the "interpretation" in the PLIC Letter—is also
incorrect. First, I have already ruled that the French Report is inadmissible due to Lite's failure to
designate Mr. French as an expert. Second, the paragraphs of the French Report cited by plaintiff
both continue beyond the portions quoted to opine that PLIC's "calculations were done as of the
current policy duration, ensuring that consistent with the contract language, [PLIC] *does not
recoup any prior losses* from poor experience." French Report ¶¶ 68, 75 (emphasis added). In
context, the French Report contradicts plaintiff's conclusion.

Defendant's expert Tim Pfeifer opined that the COI rate increase did not recoup prior
losses. *See* Decl. of Huston Smelley in Opp'n Mot. for Summ. J. ("Smelley Decl."), Ex. C-1,
Pfeifer Tr. 43:3–22, ECF No. 117-3 (Mr. Dykema: "[H]ow do you know that the effect of the
COI adjustment was not to incorporate or recoup those past gains or losses?" Mr. Pfeifer: "The
methodology PHL used . . . is to project forward from the date of the COI change. . . . And the
definition of not recouping past losses is that the projection of future profits under the revised
assumptions and new COIs are less than or equal to what the company expected on a go forward
basis under original assumptions."); Expert Report of Timothy C. Pfeifer ¶ 50, ECF No. 103-1
(describing PHLVIC's approach as "appropriate because it prevents past losses or gains from being
recouped or redistributed"). In light of this evidence, plaintiff must come forward with some fact
showing that there is a genuine issue for trial. Having no admissible evidence before me rebutting

defendant's evidence or supporting plaintiff's theory of breach, I grant summary judgment to defendant on the question of whether the COI rate increase breached the Policies by improperly recouping prior losses or failing to "determine[]" rate increases "prospectively."

## II.   Defendant Is Entitled to Summary Judgment on "Enumerated Factors" Theory of Breach

The parties dispute whether PHLVIC's use of "expectations of premium funding levels," also known as "premium persistency," in determining to implement the COI rate increase breached the Policies, which require that PHLVIC determine factors "based on [PHLVIC's] expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions." Def.'s 56.1 ¶ 10.

As I summarized in ruling on the parties' *Daubert* motions and as described by defendant's actuarial expert, PHL found "that for certain age bands, the premium funding patterns would be heavily dominated by a pattern in which there were higher premiums paid in Policy Year 1, followed by the minimum premium needed to keep the contract inforce in subsequent years," which differed from original projections of how premiums would be funded. Dec. 5, 2022 Op. & Order 30 (quotation omitted). Lite has identified evidence that the differences in premium funding level were considered in connection with the COI rate increase, *see* Pl.'s 56.1 ¶ 30, although defendant disputes the characterization of this evidence, *see* Def.'s 56.1 Opp'n ¶ 30. The Donovan Declaration also identifies premium funding patterns as a factor in PHLVIC's decision to increase rates. Donovan Decl. ¶ 8 (noting that "there was a change in expectations for future premium funding levels at higher ages and higher face amount policies" and that PHL increased the COI rate on the Policies "[i]n view of these updated expectations"). Plaintiff contends that because

"premium funding levels" is not one of the six enumerated factors PHLVIC agreed to consider in increasing the COI rate,[5] PHL breached this term of the Policies.

Defendant raises two arguments in response. First, that Lite failed to plead this theory of breach of contract in the Amended Complaint. Def.'s Opp'n 19–20; *see also* Def.'s Reply in Supp. Mot. Summ. J. ("Def.'s Reply") 12, ECF No. 115-36. Second, PHLVIC contends that the enumerated factor of "expectations of . . . investment earnings" incorporates premium funding levels because "[t]he amount available for investment depends on premium funding levels." *Id.* at 13. As to the first argument, Lite argues that it alleged in the Amended Complaint that "PHL has no contractually authorized basis for this unfairly discriminatory COI rate increase," Am. Compl. ¶ 260, and that "[t]his allegation covers any basis for the COI rate increase that is not authorized by the insurance contracts," Pl.'s Reply 7.

I need not reach the issue of whether Lite adequately alleged this theory of breach because I agree with defendant that the enumerated factor of "expectations of . . . investment earnings" encompasses the level at which premiums are funded. In *Fleisher*, Judge McMahon concluded that the "investment earnings" factor permitted consideration of premium funding levels in adjusting the COI rates and granted PLIC summary judgment on this factor. *See* Def.'s Reply 13 (citing *Fleisher*, 18 F. Supp. 3d at 476–79). Although Lite correctly notes that it is not bound by the

---

[5] Lite argues that the term "persistency" in the enumerated factors does not incorporate "premium persistency" and that "persistency" and "premium persistency" are separate concepts within insurance. I need not address this argument because PHLVIC's arguments solely concern the consideration of premium funding levels in the "expectations of . . . investment earnings" factor. *See* Def.'s Opp'n 20 n.18.

decision in *Fleisher* because it was not a party,[6] Pl.'s Reply 7, I find Judge McMahon's analysis on this theory of breach persuasive.

Relying on industry dictionaries, Judge McMahon concluded that "'expectations of . . . investment earnings' means the amount of money that [PLIC] expects . . . it will make on its investments in the future," which I agree is the unambiguous meaning of the term. *Fleisher*, 18 F. Supp. 3d at 475. Lite makes no argument advancing an alternative interpretation. Judge McMahon then reasoned that "how much money the [insurer] is going to have available to invest" is a necessary factor in determining the insurer's "expectations of . . . investment earnings," and because "the more money a PAUL policyholder places in his savings account, and the less he elects to deduct from that account to cover his minimum monthly premiums . . . the more money [PLIC] will have available to invest," expected investment earnings necessarily depend on premium funding levels. *Id.* at 476. I agree that the amount available to invest, and expectations about the amount available to invest in the future, is unambiguously a permissible consideration under the "expectations of . . . investment earnings" factor. Lite makes no effort to engage with defendant's arguments that premium funding levels can be considered as part of "expectations of . . . investment earnings." *See* Pl.'s Mem. 22–24 (arguing that premium funding levels are not an enumerated factor); Pl.'s Opp'n 21–23 (same); Pl.'s Reply 7 (arguing that *Fleisher* does not bind

---

[6] Plaintiff also argues that "Phoenix was a party and had a full and fair opportunity to litigate [relevant] issues there. Thus, *Fleisher* should be binding as to its decision that whether the 2011 COI [r]ate [a]djustment discriminated unfairly within any class of insureds could not be resolved in the insured's favor on a motion for summary judgment because of fact questions." Pl.'s Reply 7. Plaintiff is incorrect that issue preclusion should attach to PHLVIC as to the decision on summary judgment in *Fleisher*. As I have already explained, PHLVIC was not a party to *Fleisher*. Moreover, "the doctrines of issue and claim preclusion apply only where there has been a final judgment on the merits. They are thus inapplicable to a denial of a summary judgment motion, which is not a final order." *Carroll v. LeBoeuf, Lamb, Greene & MacRae, LLP*, 623 F. Supp. 2d 504, 509 (S.D.N.Y. 2009) (citation omitted).

18

plaintiff and that PHLVIC "has failed to substantively address the issue"). Accordingly, I conclude the level of premium funding was a permissible consideration under the Policy language allowing PHL to change COI rates based on its "expectations of . . . investment earnings," and grant summary judgment to defendant on this theory of breach.

### III.    Plaintiff Fails to Raise a Dispute of Fact Concerning "Unfair" Discrimination within a Class of Insureds

The parties' final dispute concerns the interpretation of the requirement that PHLVIC not "discriminate unfairly within any class of insureds." As an initial matter, plaintiff argues that the phrase "class of insureds" has a common meaning in insurance—"a group of policies considered together when the initial non-guaranteed charges or benefits are determined, such as a group of policies issued under a certain policy form number for a specific year or years, or a group of policies with common pricing charges." Pl.'s Mem. 14–15. In Lite's view, the PAUL IIIa, PAUL IIIb, and PAUL IIIc series "formed separate policy classes at inception" of the Policies. *Id.* at 15. Although defendant contends that the proper meaning of a "class of insureds" means "pricing classes that existed . . . when the PAUL IIIa/b/c policies were originally issued," that is, within each series, by age and policy face amount, PHLVIC argues that plaintiff's definition can be accepted because there is no evidence of breach under Lite's definition. Def.'s Opp'n 13. Accordingly, in interpreting this term of the Policies, I will adopt plaintiff's definition equating policy series with "class of insureds" is accurate.

Plaintiff argues that it is entitled to summary judgment on breach because "the rate hikes targeted only a subset of all of the insureds under the same product" because "rather than including all insureds under [each PAUL series], the COI rate hikes only applied" to certain ages and face amounts. Pl.'s Mem. 16. In plaintiff's telling, this is "unfair[]" discrimination. *Id.*

Defendant argues that it is entitled to summary judgment because the requirement that it not "discriminate unfairly within any class of insureds" means that any difference in rates must be "actuarially justified." *See* Def.'s Mem. 11–13. PHLVIC's actuarial expert, Tim Pfeifer, provided his opinion that the COI rate increases were actuarially justified and therefore that PHLVIC did not unfairly discriminate within a class of insureds. *Id.* at 14–15. Because plaintiff offers no evidence arguing that the increase was not actuarially justified, defendant contends it is entitled to summary judgment on this theory of breach. *Id.*

## A. The Term "Discriminate Unfairly" Is Not Ambiguous

Lite's argument that applying different COI rates within a policy series is, by itself, unfair discrimination has two flaws. First, plaintiff's reading of the provision renders the prohibition on discriminating "unfairly" superfluous; if PHLVIC were required to identically price any policy within each series, the policy language would need only prohibit PHLVIC from "discriminating" within any class of insureds. I must interpret contracts so as to give full meaning to all terms, *see Olin Corp.*, 704 F.3d at 99, and plaintiff's position fails to grapple with the requirement that the discrimination forbidden under the Policies must be "unfair[]" in some way.

Second, PHLVIC considered both age and policy face value when initially setting the COI rates within each series, and plaintiff does not dispute that insureds of different ages, policy face amounts, and risk classifications were subject to different COI rates at the inception of the Policies. *See* Def.'s 56.1 ¶¶ 11–12 (describing factors that may be used to subject different insureds to different rates); *id.* ¶¶ 14–16, 18 (describing how the PAUL IIIa, IIIb, and IIIc policy series determined initial COI rates based on age, sex, Risk Classification, and policy face amount). In other words, when *initial* COI rates were set, PHLVIC applied different rates to different policyholders within the same "class" as defined by plaintiff. Lite fails to explain why, if PHLVIC's initial COI rates differed between "a subset of all of the insureds under the same

product," Pl.'s Mem. 16, subsequent changes to COI rates varying among a subset of insureds constitutes unfair discrimination.

Plaintiff does not directly address defendant's interpretation that "unfair" discrimination means "actuarially unreasonable" discrimination. In moving for summary judgment, plaintiff contends that "PHL relies on a contorted interpretation of . . . provisions of [Actuarial Standard of Practice 2 ("ASOP 2")] to suggest that actuarial practice sanctions PHL's approach" and that "ASOP 2 is not referenced in any of the policies, and as a matter of New York law cannot be incorporated by reference into the [P]olicies." Pl.'s Mem. 17 (citing N.Y. Ins. L. § 3204(a)(1)). Finally, Lite argues that the *Fleisher* court could not determine whether PLIC unfairly discriminated within a class of insureds, and therefore that I should find this term ambiguous and grant plaintiff summary judgment by applying New York's *contra proferentem* rule against PHLVIC. *Id.* at 17–18.

I find plaintiff's reluctance to engage with defendant's position on the interpretation of this term surprising, because the incorporation of actuarial standards into the term "discriminate unfairly" was one of two primary issues addressed by the parties' *Daubert* briefing and was discussed at length by Judge McMahon in *Fleisher*. *See* Pl.'s Mem. in Supp. Mot. to Excl. Def.'s Experts 9–15, ECF No. 103 (challenging defendant actuarial expert's ability to opine that COI rate increases were actuarially reasonable); *Fleisher*, 18 F. Supp. 3d at 479–80 (interpreting the same policy language under New York law). As to the contention that the New York Insurance Law forbids "incorporat[ion]" of ASOP 2, I have already ruled that New York's statutory scheme does not apply to these contracts. Further, defendant notes that both New York and Minnesota's insurance laws prohibit "unfair discrimination" and that these and other state laws also incorporate actuarial standards in determining when discrimination is "unfair." *See* Def.'s Opp'n 15–17 (citing

N.Y. Ins. L. § 4224(a)(1) and Minn. Stat. § 72A.20(8)(a)); *Fleisher*, 18 F. Supp. 3d at 479 (determining identical policy language tracked the meaning of N.Y. Ins. L. § 4224(a)(1), which was interpreted to mean "discrimination that does not have a proper underwriting basis"). On review of the numerous authorities cited by defendant, it is clear that the meaning of "unfair discrimination" in the insurance context means discrimination that lacks an actuarial basis. A contract term is only ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person . . . who is *cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business*." *Nowak*, 81 F.3d at 1192 (emphasis added) (quotation omitted). Plaintiff has failed to show how defendant's interpretation is contrary to the view adopted by the insurance industry, or to show that there is any alternative meaning that an objectively reasonable person would attach to the term "discriminate unfairly."

Finally, Lite misplaces its reliance on the *Fleisher* opinion to argue that the term "discriminate unfairly" in the Policies is ambiguous. In *Fleisher*, Judge McMahon concluded that the meaning of this term was *un*ambiguous and meant that discrimination would "be 'fair' as long as the insurance company's differential treatment of insureds is appropriate under generally accepted actuarial standards," *i.e.*, Judge McMahon's decision aligns with defendant's position in this case. 18 F. Supp. 3d at 479. The reason Judge McMahon declined to grant the parties' cross-motions for summary judgment on this theory of breach was that the parties' experts disagreed regarding whether PLIC followed the relevant actuarial standards, creating a material dispute of fact. *Id.* at 481. The existence of the dispute of fact in *Fleisher* has no bearing upon the threshold issue of whether the term "discriminate unfairly" is ambiguous.

I agree with defendant that the term "discriminate unfairly" in the Policies means to implement rate increases that do not comply with actuarial standards.

## B. No Factual Issues Preclude Summary Judgment

Accepting defendant's argument as to the meaning of "discriminate unfairly," plaintiff argues that "nothing in ASOP 2 permits insurers to change a policy class for purposes of raising rates on just a subset of policyholders once a class has already been set" because this "defeat[s] the very purpose of having a prohibition on discriminating within a class in the first place." Pl.'s Mem. 17. Again, plaintiff conflates *any* discrimination within a class of insureds with *unfair* discrimination within a class of insureds. Moreover, Lite's argument that "raising rates on just a subset of policyholders" is not permitted flies in the face of the policy language, which permits discrimination "*within* any class of insureds," which can only mean discrimination "on just a subset of policyholders" who are part of a larger "class" of insureds. The fact that PHL raised COI rates on certain members of the class of insureds, without more, does not prove that PHL engaged in "unfair discrimination."

Plaintiff next argues that ASOP 2 "require[s] insurers to follow their Board-approved Guidelines [in considering rate increases], which PHL admits it did not do because it was following an outdated version issued in 1993, not the revised version from 2000, when it adopted the rate hikes." *Id.* (citing Pl.'s 56.1 ¶ 27). Based on the cited materials in plaintiff's Rule 56.1 statement, it appears that PHLVIC[7] erroneously referred to internal actuarial guidelines dated 1993 in support

---

[7] I note that because plaintiff has only provided deposition excerpts from *Fleisher* in support of this factual contention, it is impossible to tell whether the deponent, Gina O'Connell, was describing PHLVIC's rate increases and "board guidelines" or PLIC's, or whether both entities used the same guidelines. *See* Dykema Decl. Ex. 47, ECF No. 116-52. The deposition cover page suggests that the deposition was also taken in support of *U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co.*, No. 13-CV-1580 (CM) (JCF) (S.D.N.Y.), a case challenging some PAUL III COI rate increases, so I will assume the testimony applies to PHLVIC.

of the COI rate increase, rather than subsequently adopted guidelines from 2000. *See* Dykema Decl., Ex. 9, ECF No. 116-12 (excerpt of 1993 guidelines); *id.* Ex. 54, ECF No. 116-59 (excerpt of 2000 guidelines); Pl.'s 56.1 ¶ 27 (citing testimony from Gina O'Connell taken in support of cases against both PLIC and PHLVIC). Plaintiff contends that the 2000 guidelines "amended the provision addressing 'persistency' to make clear that . . . Phoenix could only consider 'policy persistency' in changing rates," a term that plaintiff contends clearly meant "just lapse[s]." Pl.'s 56.1 ¶ 27. Having reviewed both documents, there is no evidence that the guidelines were amended to "make clear" the definition of the term "persistency." Rather, the 1993 guidelines and 2000 guidelines both provide that "[p]ricing experience assumptions for the [c]ompany's policy persistency will be specifically developed from experience." *See* Dykema Decl., Ex. 9; *id.*, Ex. 54. Although the 1993 guidelines continue to say that "the policy design should leave the Company as much flexibility as possible to adjust future declared interest and mortality rates, prospectively, to compensate for any future re-evaluation or prospective costs of adverse persistency," this sentence explicitly refers to the *design* of policies, not the guidelines for adjusting COI rates. *Id.*, Ex. 9.

Plaintiff's argument does not explain why reference to the 2000 guidelines would have made a difference in the COI rate increase, nor does Lite explain how the COI rate increase failed to follow the 2000 guidelines, even if PHLVIC erroneously referred to the earlier guidelines when contemplating the increase.

This is plaintiff's sole factual contention on this theory of breach; it does not attempt to dispute the testimony of defendant's expert Tim Pfeifer that the COI rate increase was actuarially justified. Accordingly, plaintiff has failed to raise a material dispute of fact concerning whether

the COI rate increase complied with relevant actuarial practices, and I grant summary judgment to defendant on this theory of breach.

### CONCLUSION

Because I have rejected all three of plaintiff's theories of breach, plaintiff cannot sustain its claims for breach of contract and I grant summary judgment to defendant. The Clerk of Court is directed to enter judgment accordingly and close the case.


SO ORDERED.


Dated: May 31, 2023                                          ___/s/_____
       Brooklyn, NY                                          Allyne R. Ross
                                                             United States District Judge